IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHASE MANHATTAN MORTGAGE )
CORP., et al., )
                                    )
        Plaintiffs, )
                                      )
   v. )   Civil Action No. 01-507 (KAJ)
                                      )
ADVANTA CORP., et al., )
                                      )
        Defendants. )

## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Michael D. Goldman, Esq. and Erica L. Niezgoda, Esq., Potter Anderson & Corroon
LLP, 1313 North Market Street, 6th Fl., P.O. Box 951, Wilmington, Delaware 19899;
Counsel for Plaintiffs.
    Co-Counsel:  Jami Wintz McKeon, Esq., John C. Goodchild, III, Esq. and
    Gregory T. Parks, Esq., Morgan, Lewis, Bockius LLP, 1701 Market Street,
    Philadelphia, Pennsylvania 19103

Todd Schiltz, Esq., Wolf, Block, Schorr & Solis-Cohen LLP, Wilmington Trust Center,
1100 N. Market Street, Suite 1001, Wilmington, Delaware 19801; Counsel for
Defendants.
    Co-Counsel:  Jay A. Dubow, Esq., Patrick Matusky, Esq., Matthew A. White,
    Esq., Laura E. Krabill, Esq. and Lindsey B. Pockers, Esq., Wolf, Block, Schorr
    and Solis-Cohen LLP, 1650 Arch Street, 22nd Fl., Philadelphia, Pennsylvania
    19103

---

September 8, 2005
Wilmington, Delaware

TABLE OF CONTENTS

I.   INTRODUCTION                                                                              1

II.  FINDINGS OF FACT                                                                          2

     A.   General Background of Subprime Mortgage Securitizations              2

     B.   The History of the Parties' Subprime Mortgage Businesses            4

          1.   Chase                                                                          4

          2.   Advanta                                                                        4

     C.   Advanta's Mortgage Securitizations                                              5

     D.   Examination of Advanta by the OCC                                               6

     E.   Initial Discussions Regarding a Potential Transaction                           7

     F.   Due Diligence and Data Requests                                                  9

          1.   Residual Data                                                                  9

               a.   The Statements                                                            9

               b.   The Liquidated Mortgage Losses Report                        10

               c.   The Chris Davies Loss Report                                          11

               d.   Valuation Data                                                            11

               e.   Notes and Reports by Chase Employees                         12

               f.   Mr. Rosoff's Conversation with Mr. Hayden                      12

          2.   Zero Balance Loan Data                                                      13

     G.   Chase's Valuation of the Residuals                                              13

     H.   The Agreement                                                                       16

i

|   |   | 1. | Section 4.40 | 16 |
|   |   | 2. | Section 6.24 | 17 |
|   |   | 3. | Section 4.11(b) | 18 |
|   |   | 4. | Section 4.27 | 18 |
|   |   | 5. | Section 4.08 | 18 |
|   |   | 6. | Section 4.22 | 18 |
|   |   | 7. | Section 4.28 | 19 |
|   |   | 8. | Section 6.26 | 19 |
|   | I. | | Advanta's Posting Hierarchy | 19 |
|   | J. | | Advanta Did Not Disclose the Effects of its Posting Hierarchy to Chase | 21 |
|   | K. | | Chase Relied on Realized Loss Figures Which Did Not Include Delinquency Advances | 21 |
|   | L. | | Whole Loan Sale | 23 |
|   | M. | | Document Holdback Account | 24 |
| III. | | | CONCLUSIONS OF LAW | 25 |
|   | A. | | Choice of Law | 26 |
|   | B. | | Breach of Contract | 28 |
|   |   | 1. | Section 4.40 of the Agreement | 29 |
|   |   | 2. | Section 6.24 of the Agreement | 31 |
|   |   | 3. | Section 4.08 of the Agreement | 32 |
|   |   | 4. | Section 4.11(b) of the Agreement | 33 |
|   |   | 5. | Section 4.27 of the Agreement | 35 |
|   |   | 6. | Section 4.22 of the Agreement | 37 |

|  | 7. | Sections 4.28 and 6.26 of the Agreement | 38 |
|---|---|---|---|
| C. | | Federal Securities Fraud, Common Law Fraud and Negligent Misrepresentation | 39 |
|  | 1. | Misstatements or Omissions of Material Fact | 40 |
|  | 2. | With Scienter | 41 |
|  | 3. | Reasonable Reliance | 43 |
| D. | | Contract Damages | 48 |
|  | 1. | Section 6.24 of the Agreement | 48 |
|  | 2. | Section 4.11(b) of the Agreement | 49 |
| E. | | Advanta's Counterclaim | 51 |
| IV. | | SUMMARY OF CONCLUSIONS | 52 |

JORDAN, District Judge

## I.    INTRODUCTION

Plaintiffs Chase Manhattan Mortgage Corporation and Chase Home Mortgage Company of the Southeast (collectively, "Chase") filed this action on July 26, 2001 (Docket Item ["D.I."] 1) against defendants Advanta Corp. and certain of its affiliates[1] (collectively, "Advanta"), alleging that Advanta engaged in (1) federal securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; (2) Delaware securities fraud in violation of 6 DEL. C. § 7323(a)(2); (3) common law fraud; (4) negligent misrepresentation; and (5) breach of contract. (D.I. 1 at ¶¶ 107-44.) On September 12, 2001, Advanta filed an Answer to Chase's complaint and asserted a counterclaim for breach of contract. (D.I. 30 at ¶¶ 166-72.)

Each of the parties' claims arises out of either a Purchase and Sale Agreement dated as of January 8, 2001 (the "Agreement"), pursuant to which Advanta sold mortgage assets to Chase, or a Post-Closing Letter pursuant to which $1,270,000 was placed in a Document Holdback Account. (See D.I. 422 at ¶¶ 1-2, 127-28.) In an earlier Opinion, I denied the parties' cross-motions for summary judgment. (D.I. 382, Mem. Opinion, Mar. 2, 2004.) A bench trial followed in April and May, 2004. These are my post-trial findings of fact and conclusions of law issued pursuant to Federal Rule of

---

[1] Advanta Corp.'s affiliates include, Advanta National Bank USA, Advanta Bank Corp., Advanta Mortgage Holding Co., Advanta Mortgage Corp. USA, Advanta Residual Holding Corp., Advanta Mortgage Conduit Services, Inc., Advanta Mortgage Corp. Midatlantic, Advanta Mortgage Corp. Northeast, Advanta Mortgage Receivables Inc., Advanta Finance Corp., Advanta Conduit Receivables, Inc., and Advanta Finance Residual Corporation. (D.I. 1, Complaint Caption.)

1

Civil Procedure 52(a),[2] and on the basis of which Advanta is liable to Chase for $17,516,456.43, plus interest, and Chase is liable to Advanta for $824,190, plus interest.

## II.   FINDINGS OF FACT

### A.   General Background on Subprime Mortgage Securitizations

1.      Central to this case are residual interests in subprime mortgage securitizations.  (D.I. 422 at ¶ 11.)[3]  A subprime mortgage loan is a mortgage loan to a borrower with sub-standard credit.  (*Id.* at ¶ 10.)  In a subprime mortgage securitization, a number of mortgage loans are pooled together and sold into a trust by an "originator." (*Id.* at ¶ 12; *see also* Tr. 59:7-13.)  Interests in the trust are in turn sold to investors, known in this case as certificateholders.  (D.I. 422 at ¶ 12.)  The cash from the certificateholders goes to the originator, and the originator can then use that cash to originate more loans.  (Tr. 59:14-16.)  The certificateholders receive monthly payments, constituting a paydown of their principal investment and interest on that investment. (D.I. 422 at ¶ 13.)

2.      When a subprime mortgage securitization is formed, a number of complex, interrelated contracts are executed.  (*Id.* at ¶ 14.)  Typically a Pooling and

---

[2] Throughout these Findings and Conclusions, I have adopted without attribution language suggested by one side or the other in this dispute.  In all such instances, the Finding or Conclusion in question has become my own, based upon my review of the evidence and the law.  To the extent that any of my findings of fact may be considered conclusions of law or vice versa, they are to be considered as such.  Citations to paragraphs within these Findings and Conclusions are in the following format: for Findings of Fact, FF at ¶ __, for Conclusions of Law, CL at ¶ __.

[3] D.I. 422 is the First Amended Stipulation of Uncontroverted Facts.

2

Servicing Agreement ("PSA") is among them. (*Id.*)  In general, the PSA sets forth the

rights and obligations of the participants in the securitization. (*See id.* at ¶¶ 14, 15.)

3.      Subprime mortgage securitizations generally have a trustee that is

responsible for, among other things, reporting information about the trust activities to

the certificateholders and distributing cash to the participants in the securitizations.

(*See id.* at ¶ 16.)  Such securitizations also typically have a servicer who is responsible

for receiving payments from mortgage borrowers, depositing those payments into a

custodial account (known as a "P&I account"), handling collections and foreclosure

matters, and providing information to the trustee. (*Id.* at ¶ 17.)  In addition, the servicer

generally must preserve the trust's interest in the collateral, which could include making

tax payments, paying for maintenance, or paying attorneys' fees related to foreclosure

actions. (*Id.* at ¶ 18.)  These payments are generally known as "servicing advances" or

"escrow advances."[4]  (*Id.*)  A servicer may also be required to advance to the trust the

amount of unpaid interest and principal due from a delinquent borrower. (*Id.* at ¶ 19.)

Advances of interest are known as "delinquent interest advances," "delinquency

advances," or "interest advances."  (*Id.*)  When the servicer makes servicing or interest

advances as a result of delinquent loans, the PSA generally provides that the servicer is

entitled to be reimbursed for those advances. (*Id.* at ¶ 20.)

4.      As cash comes in from payments collected from the mortgage borrowers,

it is used to reimburse servicing advances, to repay interest and principal owed, and to

provide a monthly payment to the certificateholders; any remaining money goes into

---

[4] Advanta also sometimes refers to property preservation expenses as "corporate
advances." (D.I. 422 at ¶ 18.)

3

what is called the "residual account" or "residual interest." (Tr. 59:23-60:6.) The result of this structure, is that the residual interest holder either suffers the effect of any losses or benefits from the gains. (*See* Tr. 60:7-10.)

### B.    The History of the Parties' Subprime Mortgage Businesses

#### 1.    Chase

5.    Since before the mid-1990s, Chase had been engaged in the origination and servicing of prime mortgages. (D.I. 422 at ¶ 21.) Beginning in the mid-1990s, Chase began originating, purchasing, and selling subprime mortgage loans. (*Id.* at ¶ 22.) From 1996 until the transaction at issue in this case, Chase contracted with Advanta to have Advanta service Chase's portfolio of subprime loans. (*Id.* at ¶ 23.) In 1998, Chase sponsored its first securitization of subprime mortgage loans. (*Id.* at ¶ 24.) In 1999 and 2000, Chase was looking to either build or acquire subprime servicing capabilities and was also looking for opportunities to expand its subprime mortgage origination capabilities. (*Id.* at ¶ 25.)

#### 2.    Advanta

6.    Advanta began originating subprime mortgage loans in the mid-1980s. (*Id.* at ¶ 26.) It was one of the first companies to securitize subprime mortgage loans, executing its first such securitization in 1988. (*Id.* at ¶ 27.) From 1988 through 1999, Advanta sponsored subprime closed-end mortgage securitizations approximately four times each year. (*Id.* at ¶ 28.) Each subprime, closed-end securitization that Advanta sponsored is identified by a designation that first notes the year in which the securitization was originated, followed by a sequential number indicating which issue it

4

was for that year.  (*Id.*)  For example, Advanta Mortgage Loan Trust 1997-3 was the

third Advanta mortgage securitization executed in 1997.  (*Id.*)  Advanta was both the

servicer and the residual interest holder in the securitizations it sponsored.  (*Id.* at ¶ 29.)

## C.   Advanta's Mortgage Securitizations

7.   Pursuant to the Agreement at issue in this case, Advanta sold, and Chase

purchased, the residual interests in 30 Advanta-Sponsored Closed-End Mortgage

Securitizations (collectively, the "Securitizations").[5]  (*Id.* at ¶ 33.)  Each Securitization[6]

has a PSA that defines the rights and obligations of the parties to the Securitization.

(D.I. 422 at ¶ 36.)  In its role as servicer for the Securitizations, Advanta, through its

investor reporting department, sent monthly reports to the trustees for the

Securitizations.  The monthly reports for each Securitization included a Monthly

Summary Report and Certification; a Loan-Level Liquidated Loss Report; a Monthly

Accounting Report; an REO Log;[7] and a loan-level data tape or electronic file.  (*Id.* at ¶

39.)  Deutsche Bank is the trustee for all but one of the Securitizations.[8]  (*Id.* at ¶ 40.)  A

---

[5] The Securitizations include, Advanta Home Equity Loan Trusts 1992-3, 1993-1,
1993-2, and 1993-3; and Advanta Morgage Loan Trusts 1993-4, 1994-1, 1994-2, 1994-
3, 1994-4, 1995-1, 1995-2, 1995-3, 1996-1, 1996-2, 1996-3, 1996-4, 1997-1, 1997-2,
1997-3, 1997-4, 1998-1, 1998-2, 1998-3, 1998-4 (including Sub-Trusts A, B, & C),
1999-1, 1999-2, 1999-3, 1999-4, 2000-1, and 2000-2.  (D.I. 422 at ¶ 33.)

[6] A "Securitization" is any one of the Advanta Mortgage Securitizations listed in
note 5.

[7] Although not described be either party, the REO log appears to represent the
real estate owned in each Securitization.  (*See* PX-523 at DB 04227-30.)

[8] State Street Bank is the trustee for one part of the 1995-3 Securitization and
Deutsche Bank is the trustee for the remainder of that Securitization.  (D.I. 422 at ¶ 40.)

Deutsche Bank predecessor in interest that is named as trustee on several of the Securitizations is Bankers Trust Company. (*Id.*)

8.       The trustee for the Securitizations issued monthly reports known as Statements to Certificateholders (the "Statements"). (*Id.* at ¶ 41.) The Statements contain a variety of information about the status and performance of the Securitizations. (*Id.* at ¶ 42.) Although varying in format and presentation, each Statement included information about, *inter alia*, (a) the unpaid principal balance of the loans remaining in the Securitization, (b) the balance of the certificates or bonds that remain outstanding in the Securitization, (c) the interest rates owed to the certificateholders, (d) the amount of overcollateralization,[9] (e) information on loans that are delinquent or in foreclosure, (f) the losses suffered in the reported month, and (g) the amounts distributed by the trustee of the Securitization to, among others, the servicer, the certificateholders, and the residual interest holder. (*Id.*)

**D.       Examination of Advanta by the OCC**

9.       Part of the assets of Advanta's mortgage business were owned by Advanta National Bank ("ANB"), an entity subject to regulation by the United States Office of the Comptroller of the Currency (the "OCC"). (D.I. 422 at ¶ 97.) In 1999 and 2000, ANB, like other national banks, underwent periodic examinations by the OCC. (*Id.* at ¶¶ 97, 98.)

---

[9] The amount of overcollateralization refers to the amount of money each trust has brought in over its expenses and required monthly payments. One significance of the amount of overcollateralization is that once certain triggers are reached, i.e., there is a sufficient amount of overcollateralization, distributions are typically made to the residual interest holder. (Tr. 601:5-602:13.)

10.     On May 31, 2000, in connection with its 2000 OCC examination, ANB entered into a consent order with the OCC (the "Consent Order") which contained provisions relating to Advanta's valuation of its residual interests. (*Id.* at ¶ 99; PX-309, Consent Order.) On or about July 17, 2000, Chase received a copy of the Consent Order from the OCC. (*Id.* at ¶ 100.)

11.     On July 28, 2000, ANB executed an agreement with the OCC which also related to the valuation of Advanta's residual interests (the "OCC Agreement"). (*Id.* at ¶ 101.) Article IV of the OCC Agreement provided that ANB would "reduce the value of its residual assets" by approximately $201 million. (*Id.* at ¶ 102.) The OCC Agreement further provided that ANB would use a 6% cumulative loss forecast in its future valuations of the residual interest for the Securitizations, rather than the 3-3.5% cumulative loss forecast it had been using. (*Id.*)

## E.     Initial Discussions Regarding a Potential Transaction

12.     Earlier, on May 17, 2000, Advanta had announced that it was exploring the possible sale of some or all of the assets and liabilities of its mortgage and leasing businesses. (*Id.* at ¶ 44.) The assets of Advanta's mortgage business that were the subject of a possible sale included subprime loans (also known as "whole loans"), residual interests in Advanta's subprime mortgage securitizations, and certain assets Advanta used to originate and service subprime mortgage loans. (*Id.* at ¶ 45.) Advanta retained Salomon Smith Barney ("SSB") to serve as its investment banker for the potential sale and invited interested parties to contact SSB. (*Id.* at ¶¶ 44, 46.)

13.     Chase did so. (*Id.* at ¶ 47.) After executing a "Confidentiality Agreement," Chase was provided with a copy of a "Confidential Memorandum." (*See id.* at ¶ 48; PX-005, Confidential Memorandum; PX-004.) The Confidential Memorandum summarized the mortgage banking business of Advanta, identifying its servicing statistics, production statistics, securitization statistics, and loss statistics. (Tr. 72:17-21.) The Confidential Memorandum indicated that the losses in Advanta's mortgage securitization emerged over time to a lifetime loss rate of about 3.5%. (PX-005 at 46, Confidential Memorandum; Tr. 73:23-25; PX-1004.) However, as revealed by Ms. Chris Davies, the Advanta employee who prepared the loss statistics, the 3.5% figure did not represent the total losses on the portfolio, but rather only the principal losses. (Tr. 1054:6-1057-3.) In other words, it excluded the delinquent interest advances to the trust. (Tr. 1054:22-24.) In the spreadsheets prepared by Ms. Davies, she had included a notation at the bottom of the page stating that the losses were principal chargeoffs plus specific reserves. (Tr. 1056:16-22.) That footnote, however, was not included in the Confidential Memorandum provided to Chase (PX-005 at 46, Confidential Memorandum), nor is there any indication that this significant caveat was otherwise communicated to Chase.

14.     On June 28, 2000, Chase executives and Advanta executives had an initial meeting to discuss a potential transaction. (D.I. 422 at ¶ 50.) On or about July 20, 2000, Chase submitted a Preliminary Indication of Interest. (*Id.* at ¶ 52.) On July 25, 2000, SSB, on behalf of Advanta, invited Chase to conduct due diligence for a potential transaction. (*Id.* at ¶ 53.)

8

**F.     Due Diligence and Data Requests**

15.     Advanta created a data room in Fort Washington, Pennsylvania (the "Data Room"), in which it compiled more than 100,000 pages of documents relating to its mortgage business and operations.  (*Id.* at ¶ 54.)  Chase representatives made two visits to the Data Room, on July 26-27 and August 7-9, 2000.  (*Id.* at ¶ 55.)

**1.     Residual Data**

**a.     The Statements**

16.     On July 27, 2000, Mr. Matt Whalen of Chase sent an email to Mr. Jeff Denton of Advanta in which he requested specific documents and information "in order to evaluate the residuals."  (PX-020 at ADVE00426808.)  Mr. Denton responded to Mr. Whalen's request the next day, July 28, 2000, providing Statements to Certificateholders and electronic spreadsheets with information from the Statements; Chase referred to those spreadsheets as the "Remittance Rollups."  (D.I. 422 at ¶ 63; PX-023; PX-038; Tr. 781:22-782:17.)  Advanta provided Chase with Statements to Certificateholders on other occasions too, as requested by Chase.  (*See* D.I. 422 at ¶¶ 82, 83, 86.)

17.     The Statements were produced by the trustee based on the information supplied by Advanta in its monthly reports to the trustee.  (D.I. 422 at ¶ 39.)  In 1997, Bankers Trust Company, as trustee, changed the format of the Statements it issued.  (Tr. 624:12-625:2; PX-523.)  Instead of the four-column loss chart earlier employed *(see, e.g.,* PX-531.1000 at 4), the new format used the term "Realized Losses"[10] in a

_____

[10] The PSA for the Advanta 1997-4 Securitization defined "Realized Loss" to mean "[a]s to any Liquidated Loan, the amount, by which the Loan Balanced thereof as

9

box captioned, "Mortgage Loan Principal Reduction Information." (PX-531.002 at 3; Tr. 1521:24-1524:10.) However, the term Realized Losses was not used consistently. (See PX-531.002 at 2, 4 (compare \$0.00 in Realized Loss column on page 2 with over \$14 million in cumulative Realized Losses column on page 4).)

### b. The Liquidated Mortgage Losses Report

18. One of the monthly reports upon which the trustee relied in preparing the Statements was Advanta's Liquidated Mortgage Losses Report ("LMLR"). (See D.I. 422 at ¶ 39; PX-523 at DB04208 to DB04226.) The PSAs define Realized Loss to include unreimbursed Delinquency Advances.[11] See infra at FF ¶ 49 (PX-431 at 32, 36, PSA for 1997-4 Advanta Securitization). Despite that, the losses listed by Advanta under the heading Realized Loss, as reported to the trustee in the LMLR, were understated because they did not include the unreimbursed Delinquency Advances. (Tr. 649:10-19; see Tr. 637:5-21.)

19. The LMLR also reported total losses. (PX-523 at DB04208.) To the extent that principal losses reported in the LMLR were lower because of Advanta's

---

of the date of liquidation is in excess of Net Liquidation Proceeds realized thereon." (PX-431 at 36, PSA for 1997-4 Advanta Securitization.) The definition of "Realized Loss" is substantially the same across all of the relevant Advanta PSAs. (Tr. 1178:10-1179:6; Tr. 1186:21-1187:22.)

[11] "Delinquency Advances" are the interest portion of a delinquent monthly payment which Advanta was required to advance if a borrower on a mortgage loan in one of Advanta's securitizations failed to make a monthly payment. (Tr. 316:11-317:18; PX-1020 at 10; PX-431 at 87, § 8.9(a); D.I. 422 at ¶ 19.)

posting hierarchy,[12] interest losses were correspondingly higher, and the total losses remained the same.  (Tr. 660:11-661:12.)

### c.    The Chris Davies Loss Report

20.    Additionally, on August 15, 2000 Advanta provided Chase with a loss report, referred to by the parties as the "Chris Davies loss report."  (D.I. 422 at ¶ 87; PX-055; Tr. 805:7-21.)  The Advanta employee who transmitted it, Mr. Chris Curran, described the loss report as summarizing "losses life-to-date." (PX-055.)  Although the report contains a column labeled "Principal Charge Offs," it is not clear from the report whether the numbers listed included interest advances.[13]  (Tr. 1058:15-20.)

### d.    Valuation Data

21.    Mr. Whalen also requested and received copies of a number of documents from the Data Room which were devoted to Advanta's residual interest valuation materials.  (D-751 at ADV552917; D-500 at CMM620840.)  Those documents included[14] Advanta's December 1999 valuation binder (D-78A), Advanta's March 2000 valuation binder (D-8), and the Static Pool Cash Collection Analysis ("Static Pool

---

[12] A description of Advanta's unusual hierarchy for posting customer payments is set forth at FF ¶¶ 43-45, *infra.  See also, infra* note 13.

[13] If one knew of Advanta's practice of applying the proceeds from the mortgage liquidations to principal prior to interest, some insight about the report would be gained, because one would then understand that principal charge-offs did not reflect adjustments after interest losses. (*See* Tr. 1058:15-20.)

[14] This is not to suggest that no other documents were provided to Chase during the course of its due diligence leading up to the transaction or thereafter.  To the contrary, there were clearly numerous other documents provided both before and after the deal closed.

Analysis") (D-143).[15]  (D-295 at CMM026089.)  The valuation binders also contained

information about the lifetime losses of the securitizations.  Additionally, Chase

requested and received Advanta's Credit Risk Executive Summary which described

Advanta's method of forecasting future losses (D-561; Tr. 1464:5-17), and Advanta's

Prospectus Supplements for the Securitizations (PX-450.1001; Tr. 1436:10-1438:18).

### e.    Notes and Reports by Chase Employees

22.    One of the Chase employees participating in the due diligence process

was Mr. Michael Pocisk, who reviewed a copy of Advanta's Monthly Summary Report

and Certification and wrote "wow" next to the total loss figure for the 1997-3

Securitization, because he had never seen a loss of that magnitude in any

securitization.  (D-Pocisk-5 at CMM5087964; Tr. 1769:3-1770:24.)  Independently,

another Chase employee, Mr. Bill Steinmetz, prepared a due diligence report in which

he warned Chase that "assumptions not be based on historical performance of Advanta

originated product" (D-0347 at CMM042438), because he was worried that Chase might

"not anticipate how poorly [the 1999 and 2000 Securitizations] might perform in the

future" (D-2163(20) at 202:25-203:25, 206:20-207:7).

### f.    Mr. Rosoff's Conversation with Mr. Hayden

23.    On or about July 25, 2000, Mr. William Rosoff, the President of Advanta,

had a conversation with Mr. Luke Hayden, an Executive Vice President for Chase, in

which Mr. Rosoff informed Mr. Hayden that the OCC was going to mandate a writedown

---

[15] The Static Pool Analysis was a source of information for and backtesting of
Advanta's residual interest valuation process required by the OCC in the Consent Order
and the OCC Agreement.  (D.I. 422 at ¶ 103; PX-309 at CMM5032532; PX-311 at
ADV077957-58.)

12

of Advanta's residual assets by approximately $200 million. (Tr. 79:4-80:3.) Mr. Rosoff

also said that the OCC was going to mandate an increase in the expected lifetime

losses for the closed-end home equity loans from 3-3.5% to 6%. (*Id.*) He told Mr.

Hayden that he didn't think the OCC mandated loss assumption of 6% made any sense

and that "[t]here was almost no way to get from here to there... ." (Tr. 291:12-21; Tr.

1703:16-1704:11.)

### 2.   Zero Balance Loan Data

24.   Zero balance loans are loans which have been liquidated or "charged-off"

and whose principal is reduced to zero. (D.I. 422 at ¶ 116.) Another Chase

representative, Mr. John Barren, requested information about advances on zero

balance loans and was provided with a one-page schedule similar to PX-396, showing

that Advanta had a credit in its favor with respect to advances on zero balance loans.

(PX-396; Tr. 441:4-445:17.)

### G.   Chase's Valuation of the Residuals

25.   In determining what to bid for Advanta's residual interests, Chase of

course undertook to place a value on those assets. (Tr. 94:10-95:9.) Chase's point-

man in the valuation process was Mr. Christian Schiavone. (*See* Tr. 776:19-21.) The

most important step for Chase in valuing the residual interests was to develop a loss

assumption, i.e., an opinion about the likely losses to be sustained over the course of

the securitized loans.[16] (Tr. 1124:2-1125:19.) Historical losses were an important

---

[16] Witnesses for both parties agreed that developing a loss assumption is the
most important factor in a valuation of residual interests. (Tr. 69:20-71:10; Tr. 220:1-8;
Tr. 1929:25-1930:4.)

factor in Chase's analysis because they are considered one of the best predictors of future performance and because historical loss experience is an indicator of the performance of the mortgage originator and servicer, as it shows the quality of the loans they are producing and the effectiveness of their collection abilities. (Tr. 69-20:71:11; see Tr. 820:5-823:22.)

26.    In formulating its loss assumption, Chase relied on the historical Realized Losses in the Statements to Certificateholders and Remittance Rollups provided by Advanta. (Tr. 777:3-777:7; Tr. 91:25-92:17.) Once Chase determined that the Remittance Rollups were periodic presentations of the Realized Losses in the Statements to Certificateholders, Chase mainly used the Remittance Rollups in the course of its analysis because they allowed Chase to see not only the level of losses, but also the timing of the emergence of losses. (Tr. 790:12-793:1, 796:12-797:7.)

27.    In developing a generalized opinion about the loss performance of Advanta's mortgage securitizations, Chase focused on the 1997 securitizations. (Tr. 788:25-790:11.) Chase chose the 1997 securitizations because it believed the underlying loans for those securitizations were not so old so as to be nearly paid off (and therefore associated with less residual value) and not so recent as to lack enough historical losses to present significant data. (See id.; Tr. 1047:15-1048:21.) Thus, Chase decided that the 1997 mortgage securitizations, which were three to four years old, were in the "sweet spot" of the most relevant information. (Tr. 790:9-11.) Chase also compared the historical loss information from one of the 1996 securitizations against the loss assumptions it was deriving for the 1999-2 securitization. (PX-037; Tr. 948:24-953:22.)

14

28.    Based on the historical information reviewed by Chase, including the Confidential Memorandum provided by Advanta, the Statements to Certificateholders, the Remittance Rollups, and the Chris Davies Loss Report, Chase determined that the Advanta securitizations generally experienced a lifetime loss performance of 3-4%. (Tr. 809:4-15.) Chase also asked an analyst from Bear Stearns to perform a similar analysis, which confirmed Chase's opinions regarding the lifetime loss performance of the Advanta securitizations. (Tr. 862:1-864:23.)

29.    Chase then applied the general performance data to the individual securitizations. (Tr. 809:4-810:19.) This process involved the use of credit models to produce a lifetime loss expectation for each securitization analyzed, based on the historical performance of that securitization coupled with the loan-level characteristics of the loans remaining in the securitization. (*See* PX-087; Tr. 809:17-814:16.) In this analysis, Chase used the historical Realized Loss information from the Statements and Remittance Rollups [17] (Tr. 814:11-815:4) and the loss severity information from the Chris Davies Loss Report (Tr. 806:23-808:23, 819:5-11, 824:9-825:15).

30.    Finally, Chase backtested the results of the credit models against the actual, historical Realized Losses, to test the reasonableness of its results. (Tr. 816:25-818:3.)

31.    Once Chase had derived its loss assumptions, it used those together with the prepayment assumptions to derive the projected cash flow that Chase anticipated

---

[17] *Compare* PX-038 at 4 (showing historical Realized Losses of $6,104,450.34 for Group 1) *with* PX-087 (showing historical losses of $6,104,450.34 for Group 1 in one of the credit models).

would be received by the Advanta residual interests. (Tr. 826:16-827:20.) Chase then

discounted the cash flow using a 25% discount rate to determine the present value of

those interests. (Tr. 829:24-830:17.) Chase thus arrived at an initial bid of $319 million

for Advanta's residual interests.[18] (*Id.*; Tr. 100:8-10; PX-196; D.I. 422 at ¶ 109.)

### H.   The Agreement

32.   The Agreement between Chase and Advanta was executed as of January

8, 2001, and the deal closed on February 28, 2001 (the "Closing"). (D.I. 422 at ¶¶ 111,

113.) There are numerous schedules, exhibits, and addenda to the Agreement. (*Id.* at

¶ 112.)

### 1.   Section 4.40[19]

33.   Section 4.40 of the Agreement warrants that "[a]ll ... *advances on zero*

*balance Loans are disclosed* in Section 4.40 of the Company Disclosure Schedule."

(PX-001 at 47, the Agreement (emphasis added).) Advanta disclosed delinquent

interest advances on zero balance loans under the heading "Charge-Off interest to be

recovered"[20] in Section 4.40 of the Company Disclosure Schedule. (*See, e.g.*, PX-373

at CMM5257321, Section 4.40 Company Disclosure Schedule.) Advanta did not

---

[18] Later negotiations resulted in a purchase price $25 million higher than Chase's
initial bid. (*See* Tr. 110:14-16; PX-198; PX-213; D.I. 422 at ¶ 110.)

[19] The Sections of the Agreement are not discussed in the order of their
appearance in the Agreement but are discussed in an order roughly corresponding to
subject matter.

[20] Michael Pocisk, one of the Chase employees who visited Advanta while
conducting due diligence, took notes indicating that the term "Charge-off to be
recovered" was discussed at some point during his visit. (D-Pocisk at CMM5087959,
Pocisk notes.) His notes, however, do not reveal whether the term was discussed with
regard to advances on zero balance loans. (*See id.*)

16

include advances on zero balance loans in its disclosure on the first page of Section 4.40 of the Company Disclosure Schedule under the headings "Zero UPB" (unpaid principal balance), "Escrow $," or "Corporate Advance $." (*Id.* at CMM5257106; Tr. 357:24-361:16.)

## 2.  Section 6.24

34.    Section 6.24 of the Agreement required, *inter alia,* that Advanta "take such actions as are necessary so as to ensure that, as of the Closing Date, there are ... no non-recoverable advances on zero balance loans... ." (PX-001 at CMM5254315, the Agreement at 71.)

35.    Section 6.24 was heavily negotiated. (Tr. 447:12-449:11; Tr. 489:23-491:15; Tr. 1421:16-25.) Mr. John Barren, the Controller for Chase Home Finance,[21] sought a representation from Advanta that there would be "*no ...escrow Advances* on zero balance Loans." (D-0329 at ADVE01379758 (emphasis added); Tr. 447:24-448:6; Tr. 494:17-495:15.) Advanta proposed the language "no ... unrecoverable escrow Advances on zero balance Loans." (D-332; *see* Tr. 447:12-448:6.) Ultimately, the parties agreed to the language "no non-recoverable advances on zero balance loans... ." (PX-001 at CMM5254315, the Agreement at 71.) Thus, in the final version, the term "escrow" was removed and the term "non-recoverable" was added. (*See id.*)

36.    In reaching the agreed upon language, Mr. Barren of Chase and Mr. James Shreero, Advanta's Chief Accounting Officer, discussed the meaning of the term "non-recoverable" in the context of the Agreement. (Tr. 448:7-449:11; Tr. 489:23-

---

[21] Chase Home Finance is the name of Chase's residential lending division. (Tr. 422:24-25.)

17

491:3.) Mr. Barren expressed his understanding that the term "non-recoverable" meant not recoverable from a borrower or a third-party guarantor of that mortgage loan. (*Id.*) Mr. Shreero did not recall the specifics of the conversation, but thought it possible Mr. Barren "said something like that... ." (Tr. 1421:16-25.) Additionally, Mr. Barren and Shreero agreed that one purpose of Section 6.24 was to prevent financial harm to Chase. (Tr. 449:12-25, 491:7-15; Tr. 1419:1-1420:20.)

### 3.   Section 4.11(b)

37.   Advanta warranted in Section 4.11(b) of the Agreement that it "has compiled in all material respects with all of the material provisions of the Material Company Contracts" which included the PSAs. (PX-001 at CMM5254281, the Agreement at 37.)

### 4.   Section 4.27

38.   Section 4.27 of the Agreement required that Advanta be in compliance with "[a]ll federal, state, local or foreign laws or regulations... ." (PX-001 at CMM5254289, the Agreement at 45.)

### 5.   Section 4.08

39.   Section 4.08 of the Agreement required that Advanta was "in possession of and [had] good title to or a valid leasehold interest in ... all of the Assets, ... except for Permitted Liens." (PX-001 at CMM5254277, the Agreement at 33.)

### 6.   Section 4.22

40.   Section 4.22 required that the Advanta balance sheet "was ... prepared in accordance with the books and records of the Company[,] .. fairly presents the financial condition of the Business... [,] and ... was compiled from the business books and

18

records regularly maintained by the management and used to prepare the financial statements of the Company." (PX-001 at CMM5254289, the Agreement at 45.)

### 7. Section 4.28

41.     In Section 4.28 of the Agreement, Advanta warranted that the information contained on a magnetic computer tape containing data on the mortgage loans, set forth in Section 4.28 of the Company Disclosure Schedule (the "June 30, 2000 Tape") "(i) was true and correct in all material respects and (ii) was a true and correct copy of the information relating thereto contained in the loan servicing systems of the Company... ." (PX-001 at CMM5254290, the Agreement at 46.)

### 8. Section 6.26

42.     In Section 6.26 of the Agreement, Advanta warranted that the information contained in the fields of the "Closing Tape," another magnetic computer data tape, would "be true and correct in all material respects... ." (PX-001 at CMM5254316, the Agreement at 72.)

### I. Advanta's Posting Hierarchy

43.     Advanta developed a process for valuing its residual interests that included an unconventional method of accounting for losses and was a departure from common industry practice. (Tr. 326:11-331:6.)

44.     Under Advanta's PSAs, if a borrower on a mortgage loan in one of Advanta's securitizations failed to make a monthly payment, Advanta was required to advance, in other words to pay into the trust, the interest portion of the delinquent monthly payment; this was known as a "Delinquency Advance." (Tr. 316:11-317:18; PX-1020 at 10; PX-431 at 87, § 8.9(a); D.I. 422 at ¶ 19.) An exception permitted

19

Advanta to avoid making the advance if it believed that the advance would not ultimately be recovered from the related mortgage loan. (PX-431 at 87, § 8.9(a); Tr. 318:18-319:10.) In the event that a borrower made the missed payment, Advanta could use that payment to reimburse itself for any outstanding Delinquency Advances. (Tr. 318:4-9; PX-431 at 87, § 8.9(a).) If, however, the borrower continued to miss payments, Advanta could foreclose on the property or otherwise take steps to liquidate the loan. (Tr. 318:10-17; PX-1020 at 11.) The resulting liquidation proceeds could then become the source of reimbursement for the Delinquency Advances. (Tr. 319:11-21; PX-1020 at 12.) Significantly, Delinquency Advances or other advances not reimbursed from the related liquidation proceeds or some third-party insurance related to that loan would become, and are referred to in the PSAs as, "non-recoverable advances."[22] (Tr. 320:2-9; PX-1020 at 13; Tr. 332:13-22; Tr. 448:12-22.) The PSAs further state that after the servicer forecloses or liquidates a delinquent loan, the servicer must report any Realized Loss to the trustee.[23] (PX-431 at 79-80, §§ 7.8(b) and (b)(vi) (listing Realized Losses as one of the items which "must be prepared and furnished by the Master Servicer.").)

45.    The common industry practice in the mortgage loan industry was to use a posting hierarchy called "EIPA," in which liquidation proceeds were posted in the following order: first to "E," expenses and escrow, then "I," interest (e.g. Delinquency Advances), then "P," principal, and finally "A," ancillary fees. (Tr. 336:3-9; Tr. 341:11-

---

[22] See infra at CL ¶ 10, discussing the meaning of "non-recoverable advances."

[23] Advanta included information labeled Realized Loss in its monthly reports for each Securitization. See supra at FF ¶¶ 18-19.

19.) Thus, liquidation proceeds were posted to interest before principal. (Id.) Advanta, however, used a unique "EPIA" posting hierarchy, in which liquidation proceeds were posted to principal before delinquent interest advances. (Tr. 326:11-331:6.) This had the effect of shifting into the interest-loss category losses that would otherwise have appeared as principal losses. (Tr. 660:11-661:12; see supra at FF ¶ 19.)

## J.    Advanta Did Not Disclose the Effects of its Posting Hierarchy to Chase

46.    Ms. JoAnn Dolan, the Senior Vice President of Loan Administration for Advanta at the time of the transaction at issue, became concerned that Chase might not be aware of the effects that Advanta's posting hierarchy had on the reported loss figures. (PX-268; Tr. 738:22-739:2.) Her concerns were shared by Advanta employees Scott Heidemann, the head of Investor Accounting, and Richard Yonemura, the head of Investor Reporting. (Tr. 701:17-703:20; PX-263; PX-254.) Ms. Dolan sent at least three emails to Mr. Shreero expressing her concerns and asking for his advice on the issue. (PX-268; PX-273; PX-276.) Mr. Shreero did not inform Chase of the concerns raised by Ms. Dolan, Mr. Heidemann, or Mr. Yonemura. (Tr. 754:21-25.)

## K.    Chase Relied on Realized Loss Figures Which Did Not Include Delinquency Advances

47.    In March 2000, when the parties' subprime mortgage businesses were combined, Advanta's mortgage employees became Chase employees. (See, e.g., Tr. 1051:21-1052:3.) Mr. Schiavone began to work with Chris Davies, the Advanta employee who prepared her eponymous report indicating the losses for the Securitizations. (Tr. 836:19-838:7; Tr. 1062:3-10.)

21

48.    Ms. Davis reviewed Mr. Schiavone's loss assumptions and realized that they matched up almost exactly with her principal-only loss assumptions (i.e., the loss assumptions that were derived from the historical Realized Loss data that did not include losses on account of unreimbursed Delinquency Advances. (Tr. 1062:22-1063:5.) When Ms. Davies advised him to include an additional interest-loss component, Mr. Schiavone was initially confused because he believed that his purchase loss assumptions already included interest losses. (Tr. 838:8-839:8; Tr. 864:25-865:24.) After a review of the Realized Loss data reported in the Statements, and the definitions of Realized Loss and "Net Liquidation Proceeds" in the PSAs, it became clear that the Realized Loss numbers on the Statements matched Ms. Davies' numbers, which excluded losses on account of unreimbursed Delinquency Advances. (Tr. 864:25-865:24; Tr. 834:10-835:23; Tr. 1069:13-1070:2; PX-573.)

49.    The PSA for the Advanta 1997-4 Securitization defined Realized Loss to mean "[a]s to any Liquidated Loan, the amount, by which the Loan Balanced thereof as of the date of liquidation is in excess of Net Liquidation Proceeds realized thereon." (PX-431 at 36, PSA for 1997-4 Advanta Securitization.) "Net Liquidation Proceeds" is also defined, "[a]s to any Liquidated Loan, Liquidation Proceeds net of, without duplication, Liquidation Expenses and unreimbursed Servicing Advances, unreimbursed Delinquency Advances and accrued and unpaid Servicing Fees through the date of liquidation relating to such Liquidated Loan."[24] (*Id.* at 32.) Thus, as

_____

[24] The definitions of Realized Loss and "Net Liquidation Proceeds" are substantially the same across all of the relevant Advanta PSAs. (Tr. 1178:10-1179:6; Tr. 1186:21-1187:22.)

22

admitted by Advanta's Rule 30(b)(6) witnesses, Realized Loss, as defined in the PSAs, should include unreimbursed Delinquency Advances, including interest losses. (Tr. 1344:8-1345:16.) It is undisputed that the Realized Loss figures reported in Advanta's Statements were not calculated in a manner consistent with the definition of "Realized Loss" in the PSAs because those figures left out interest losses. (Tr. 1346:13-1347:4.)

### L.   Whole Loan Sale

50.    Chase also purchased whole loans from Advanta. (D.I. 422 at ¶¶ 114-15.) Whole loans are mortgage loans that are retained on a company's balance sheet rather than being sold into securitizations. (*Id.* at ¶ 114.) The purchase of the whole loans was accomplished by two separate agreements, a Mortgage Loan Purchase and Sale Agreement and related schedules thereto, dated as of February 23, 2001, and a Mortgage Loan Purchase and Sale Agreement and related schedules thereto, dated as of February 28, 2001. (*Id.* at ¶ 115.)

51.    Chase undertook a separate process to value the whole loan portfolio, using something called the "S&P Levels" program, which employs an industry-based model. (*See* Tr. 1354:4-1356:10.) That program produced lifetime cumulative loss assumptions which Chase then compared to the historical performance of the Advanta securitizations to validate the program's results. (*Id.*) Based on the results of the comparison between the historical performance and the cumulative loss assumptions derived from the S&P Levels program, Chase was able to adjust its assumptions.[25] (Tr. 1356:19-24.)

------

[25]Chase relied on the historical loss information when determining the reasonableness of the program results. (*See* Tr. 1354:8-1356:24.)

23

## M.    Document Holdback Account

52.    Section 1.05(m) of the Agreement memorialized the parties' decision to set aside a particular amount of money in a "Document Holdback" account, in "an amount equal to $55 for each document that is reported in the Document Report as a Missing Document or a defective Document under the terms of Section 1.05(m)(i)."[26] (PX-001 at 20; PX-001, Section 1.05(m); Tr. 1854:2-6.)  Based on a total of 23,091 starting exceptions, the parties agreed to place $1,270,000 in the Document Holdback Account.  (D.I. 422 at ¶ 128; D-2028 at CMM5136316, Document Exception Holdback Status 03/02.)

53.    Pursuant to a post-closing letter agreement executed as of the date of Closing (D.I. 422 at ¶ 127), Chase was required within two weeks of the Closing to "release any funds in the Document Holdback Account in excess of the amount that would have been the amount of the Document Holdback at Closing, computed in accordance with the provisions of the Agreement."  (D-2016 at CMM5254351, Post-Closing Letter at 2.)  The parties dispute the number of document exceptions outstanding as of the Closing.

---

[26] Section 1.05(m)(i) provides, in relevant part, that

The Document Holdback shall be retained from the Purchase Price by Buyer. ... The Company shall cause the Custodian to provide a document level inventory report for all mortgage loans in the company's owned and securitized mortgage loan servicing portfolio ... that (A) are not contained in the Custodial Files (the "Missing Documents") or (B) do not meet the requirements of the applicable Servicing Agreements, excluding for this purpose those immaterial document exceptions mutually determined by the parties to be immaterial (the "Defective Documents").

The defects or deficiencies in the loan documents for loans that Advanta was transferring to Chase were referred to as "document exceptions."

24

54.     The parties used Deutsche Bank as the custodian for the Document
Holdback Account. (Tr. 1864:8-10.) As custodian, Deutsche Bank issued a report
regarding that account.[27] (See Tr. 1864:11-18.) The summary page indicates that
there were 23,091 total starting exceptions, which includes the "original population" on
October 2000 (20,987) and those added on March 23, 2001 (2,104). (D-2028 at
CMM5136316.) It also indicates that, as of March 2002, 21,451 exceptions were
cleared on the project and 1,640 remain. (Id.) It does not indicate, however, how many
exceptions were outstanding as of the Closing on February 28, 2001. (See id.)
Advanta presented the only evidence of the number of document exceptions as of the
Closing in the Advanta Mortgage Securitization Portfolio (the "Portfolio").[28] (D-2017.)
According to the Portfolio, there were 6,306 document exceptions as of the Closing.
(Tr. 1859:9-17; D-2017.)

III.    **CONCLUSIONS OF LAW**

1.      Jurisdiction over this case is proper under Section 27 of the Securities
Exchange Act of 1934, 15 U.S.C. §78aa, 28 U.S.C. §§ 1331, 1332, and 1367. Venue is
proper under 28 U.S.C. § 1391(b).

---

[27] Exhibit D-2028 shows the summary page of a similar report as issued by
Deutsche Bank.

[28] The Portfolio is the only evidence on this point because the report summary
that Chase points to does not indicate whether any of the document exceptions had
been cleared between October 2000, the date of the "original population," and March
23, 2001, the date the exceptions from the 2000-2 securitization were added. (See D-
2028.)

25

## A.    Choice of Law

2.    I noted in my March 4, 2004 Opinion that "[a]ny claims that sound in contract in this case are governed by Delaware law by the express terms of the Agreement ... ." *Chase Manhattan Mortg. Corp. v. Advanta Corp.*, No. Civ. A. 01-507(KAJ), 2004 WL 422681, at *5 n.12 (D. Del. Mar. 4, 2004). As to the fraud claims, I noted in that context that there was "no meaningful distinction between Delaware law on fraud and Pennsylvania law on fraud." (*Id.*) There is a meaningful distinction at this point, however, bearing on the burden of proof. *Compare Blumenstock v. Gibson*, 811 A.2d 1029, 1034 (Pa. Super. Ct. 2002) (noting that a plaintiff is required to prove fraud by clear and convincing evidence); *with Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 389 (D. Del. 2005) (noting Delaware law that "[t]he plaintiff must prove the elements of common law fraud by a preponderance of the evidence") (citing *Lord v. Peninsula United Methodist Homes, Inc.*, No. Civ.A. 97C-10-012, 2001 WL 392237, at *5 (Del. Super. Ct. Apr. 12, 2001)). Thus, a choice of law analysis is required to determine whether Chase must prove each element of fraud by a preponderance of the evidence or by clear and convincing evidence.

3.    A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's law governs the case before it. *Hionis Int'l Enters., Inc. v. Tandy Corp.*, 867 F. Supp. 268, 271 (D. Del. 1994) (citing *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Delaware law, the law of the state with the most significant relationship to the transaction applies. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 40 (Del. 1991) (adopting most significant relationship test from

26

Restatement (Second) of Conflicts, § 145). For cases involving fraud or

misrepresentation claims, Section 148 of the Restatement (Second) of Conflicts lists

contacts that are relevant to a choice of law determination. *Brown v. SAP Am., Inc.*,

No. C.A. 98-507-SLR, 1999 WL 803888, at *6 (D. Del. Sept. 13, 1999). Those contacts

include:

> (1) the place, or places, where the [injured party] acted in reliance upon
> defendant[s'] representations,
> (2) the place where the [injured party] received the representations,
> (3) the place where the defendant[s] made the representations,
> (4) the domicil ... place of incorporation and place of business of the
> parties,
> (5) the place where a tangible thing which is the subject of the transaction
> between the parties was situated at the time, and
> (6) the place where the [injured party] is to render performance under a
> contract which [it] has been induced to enter by the false representations
> of the defendant[s].

*Id.* (citing Restatement (Second) of Conflicts, § 148(2)).

    4.    Applying these factors, it appears that Pennsylvania has the most

significant relationship with the transaction at issue. First, Chase asserts that certain

documents and information provided or made available to Chase in the Pennsylvania

Data room were false or misleading. (*See* D.I. 384 at 14). Second, various

representations were made by communications sent by Advanta employees from

Pennsylvania. Third, through the transaction, Chase acquired real property and other

tangible assets located in Pennsylvania. (D.I. 453 at ¶ 132.) Fourth, the Agreement

was executed in Pennsylvania and the Closing took place in Pennsylvania. (*Id.*) The

parties' places of incorporation are not a telling factor because they are incorporated in

several states, namely Delaware, New Jersey, Pennsylvania, Florida, and Utah. (D.I. 1

at ¶¶ 6-8; D.I. 30 at ¶¶ 6-8; D.I. 348 at 9.)  The only other place with a relationship to

the transaction at issue is New Jersey, because Chase's headquarters are located

there[29] (D.I. 1 at ¶ 6), and so New Jersey is where communications were received by

Chase employees and where Chase acted in reliance upon Advanta's representations.

(D.I. 348 at 9.)  Based on a consideration of these factors, Pennsylvania has the most

significant relationship to the transaction and, therefore, Pennsylvania law will govern

Chase's fraud and misrepresentation claims.[30]

## B.    Breach of Contract

5.     To state a claim for breach of contract under Delaware law, a Plaintiff

must establish that a contract existed, that the defendant breached an obligation

imposed by the contract, and that the breach resulted in damage to the Plaintiff.  *VLIW*

---

[29] Chase Home Mortgage Company of the Southeast, however, is incorporated
and has its principal place of business in Florida.  (D.I. 1 at ¶ 7.)

[30] If one were to consider New Jersey as having at least an equally significant
relationship to the transaction as Pennsylvania, the same heightened clear and
convincing evidence standard would still apply.  *See Fox v. Mercedes-Benz Credit
Corp.*, 658 A.2d 732, 736 (N.J. Super. Ct. App. Div. 1995) (citing *Stochastic Decisions,
Inc. v. DiDomenico*, 565 A.2d 1133 (N.J. Super. Ct. App. Div. 1989), *cert. denied*, 583
A.2d 309 (N.J. 1990)).  Additionally, there is no conflict between proving fraud under
New Jersey law or Pennsylvania law because both states' laws require proof of
essentially the same substantive elements.  *Compare Bortz v. Noon*, 729 A.2d 555, 560
(Pa. 1999) (noting the elements as "(1) [a] representation; (2) which is material to the
transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to
whether it is true or false; (4) with the intent of misleading another into relying on it; (5)
justifiable reliance on the misrepresentation; and, (6) the resulting injury was
proximately caused by the reliance.") (internal citations omitted) *with Gennari v.
Weichert Co. Realtors*, 691 A.2d 350, 367-68 (N.J. 1997) (noting the five elements of
common-law fraud as "(1) a material misrepresentation of a presently existing or past
fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other
person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting
damages.") (internal citation omitted).

28

Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003). In construing the terms of a contract, a court first looks to the plain meaning of the contractual terms. City Investing Co. Liquidating Trust v. Cont'l Cas. Co. Liquidating Trust, 624 A.2d 1191, 1197 (Del. 1993) (internal citation omitted); Sonitrol Holding Co. v. Marceau Investissments, 607 A.2d 1177, 1182 (Del. 1992) (internal citations omitted). In so doing, a court must give effect to each clause and phrase of a contract and cannot ignore or exclude any contractual language. See Eugene A. Delle Donne and Son, L.P. v. Applied Card Sys., Inc., 821 A.2d 885, 887 (Del. 2003) (noting that the contract must be "considered as a whole"). In addition, a court should not interpret a contract in a way that renders a provision illusory or meaningless. Sonitrol, 607 A.2d at 1183 (internal citation omitted); O'Brien v. Progressive N. Ins. Co., 785 A.2d 281, 287 (Del. 2000) (internal citation omitted). A court may also look to the standard industry meaning of terms in a contract between two participants in the same industry, even if the term is not ambiguous. FleetBoston Fin. Corp. v. Advanta Corp., No. Civ.A. 16912-NC, 2003 WL 240885, at *21 & n.79 (Del. Ch. Jan. 22, 2003); Radio Corp. of Am. v. Philadelphia Storage Battery Co., 6 A.2d 329, 334 (Del. 1939). Finally, if after looking to the plain meaning and industry standard meaning of terms, a court finds that a contractual provision is ambiguous, the court can consider extrinsic evidence of the negotiations and intent of the parties. Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997) (internal citations omitted).

### 1. Section 4.40 of the Agreement

6. In Section 4.40 of the Agreement, Advanta warranted that "[a]ll investor cash shortages, unidentified principal and interest advances, or advances on zero

29

*balance Loans are disclosed* in Section 4.40 of the Company Disclosure Schedule."

(PX-001 at 47, the Agreement (emphasis added).)  Chase alleges that Advanta did not

adequately disclose all advances on zero balance loans because Advanta did not

disclose delinquent interest advances, one type of advance on zero balance loans,[31] in

the chart on the first page of Section 4.40 of the Company Disclosure Schedule.  (D.I.

452 at ¶ 155.)

7.     Chase has failed to establish by a preponderance of the evidence that

Advanta did not adequately disclose all advances on zero balance loans.  There is no

dispute that Advanta disclosed delinquent interest advances on zero balance loans

under the heading "Charge-Off interest to be recovered"[32] in Section 4.40 of the

Company Disclosure Schedule.  (*See, e.g.*, PX-373 at CMM5257321, Section 4.40

Company Disclosure Schedule.)  While Advanta did not include all advances on zero

balance loans in its chart on the first page of the Section 4.40 Company Disclosure

Schedule,[33] there was no requirement in the Agreement that such advances had to be

disclosed on the first page.  (*See* PX-001 at 47.)  A party such as Chase, sophisticated

---

[31]  In general, there are several types of advances that a servicer may be required to make, namely "servicing" or "escrow" advances, "delinquent interest advances," and "corporate advances."  (D.I. 422 at ¶¶ 18, 19.)

[32]  As previously noted, *see supra* note 20, one of the Chase employees who visited Advanta while conducting due diligence, Michael Pocisk, took notes which reflect that "Charge-off to be recovered" was discussed during his visit (D-Pocisk at CMM5087959, Pocisk notes), although his notes do not reveal the context of that discussion.  (*See id.*)

[33]  There were headings on that Schedule for "Zero UPB" (unpaid principal balance), "Escrow $," and "Corporate Advance $."  (*Id.* at CMM5257106; Tr. 357:24-361:16.)

30

in investor accounting, could be expected to understand that the chart on the first page does not purport to show delinquent interest advances, being that delinquent interest advances are different from the escrow advances or corporate advances disclosed in the chart. (Tr. 583:7-18.) Thus, if one were looking for data on delinquent interest advances, and saw that it was not on the first page chart, one would look somewhere other than the first page, and, if the data could not be located, would ask for clarification.

8.      Chase has failed to establish by a preponderance of the evidence, that Advanta's disclosure of delinquent interest advances on zero balance loans under the heading "Charge-Off interest to be recovered," in the context of the documents exchanged, was inadequate under, and therefore a breach of, Section 4.40 of the Agreement.

### 2.      Section 6.24 of the Agreement

9.      As of the Closing Date, there were $17,516,456.43 in outstanding advances on zero balance loans with respect to the Securitizations. (D.I. 422 at ¶ 122.) Chase argues that these outstanding advances are "non-recoverable" under the meaning of Section 6.24. (D.I. 452 at ¶¶ 144-153.) Thus, it becomes necessary to define the terms of Section 6.24 of the Agreement to determine if that approximately $17.5 million constituted "non-recoverable advances."

10.     A "non-recoverable advance" is generally understood to have reference to a particular mortgage relationship.[34]  (Tr. 1198:15-25.) It is not synonymous with

---

[34] Advanta's expert on standard industry definitions did not disagree with the definition offered by Chase's expert in this regard. (See Tr. 1867:11-1912:25.)

31

"unreimbursability," because it does not mean that the servicer will not be repaid at some point. (*Id.*) It does, however, mean that the advance cannot be repaid by the liquidation of the property or by pursuing a deficiency claim against the borrower or third-party guarantor of that mortgage. (*Id.*; Tr. 320:2-321:4.) This meaning comports with the understanding that Mr. Barren, of Chase, expressed during the negotiations with Mr. Shreero, of Advanta, on this point.[35] (Tr. 448:7-449:11; Tr. 489:23-491:15.) Thus, the approximately $17.5 million in advances were "non-recoverable advances" as that term is properly understood in the context of Section 6.24 of the Agreement, the typically understood meaning of the term, and the negotiations between the parties. Advanta therefore breached Section 6.24 of the Agreement because, as of the Closing, the Securitizations had $17,516,456.43 in non-recoverable advances.

### 3. Section 4.08 of the Agreement

11. Section 4.08 of the Agreement required that Advanta was "in possession of and [had] good title to or a valid leasehold interest in ... all of the Assets, ... *except for Permitted Liens*." (PX-001 at CMM5254277, the Agreement at 33 (emphasis added).)

---

[35] Additionally, this meaning also makes the most sense because the parties understood that Chase would be the servicer and the residual interest holder in the Securitizations after the purchase from Advanta. Because the overcollaterialization of the mortgage trust is generally considered an asset of the residual interest holder, or at least a potential asset, if such advances could be recovered out of the trust, it would be equivalent to the residual interest holder reimbursing the servicer with funds that the residual interest holder would have likely received. (Tr. 315:4-21; PX-1020 at 7.) Because Chase is both the servicer and the residual interest holder, Advanta's interpretation of the term "non-recoverable advance" would essentially result in Chase, as servicer, receiving money which would have likely gone to Chase anyway, as the residual interest holder. (Tr. 351:15-21.) Thus, Advanta's proposed interpretation would have a counter-intuitive effect contrary to the undisputed purpose of Section 6.24, which was to prevent financial harm to Chase. *See supra* at FF ¶ 36.

32

Chase asserts that Advanta breached this provision because the residual interests it acquired were "encumbered" by the advances on zero balance loans. (D.I. 452 at ¶ 194.)

12.    Chase did not present testimony on the meaning or negotiation of Section 4.08. If the outstanding advances on zero balance loans are similar to the other obligations of the servicer, then they are not appropriately considered "encumberances" on the residual interests any more than such things as the trustee's fee, the amount owed to the certificateholders, or the servicing fee.

13.    In any event, if the outstanding advances were considered to be "encumberances," they would also be considered "Permitted Liens" under the Agreement (PX-001 at CMM5254277, the Agreement at 33) because "Permitted Liens" are defined as including "any security interests or other Liens granted under or in connection with ... securitization transactions... ." (PX-001 at CMM5254268, the Agreement at 24.) Advanta was required to advance delinquent interest and was entitled to be reimbursed for those advances. (Tr. 316:11-317:18; PX-1020 at 10; PX-431 at 87, § 8.9(a); D.I. 422 at ¶ 19.) Thus, any advance made and not yet reimbursed would be a permitted lien under the Agreement. Therefore, Advanta did not breach Section 4.08 of the Agreement.

### 4.    Section 4.11(b) of the Agreement

14.    Advanta warranted in Section 4.11(b) of the Agreement that it "has complied in all material respects with all of the material provisions of the Material Company Contracts," which included the PSAs. (PX-001 at CMM5254281, the Agreement at 37.) Chase asserts that Advanta's reporting of Realized Loss was not in

33

compliance with its PSA for the 1997-4 securitization and therefore, Advanta breached Section 4.11(b).  (D.I. 452 at ¶¶ 185-191.)

15.    Section 7.8(b) of Advanta's PSA for the 1997-4 securitization identified certain information which Advanta, as "Master Servicer," was required to prepare and furnish to the trustee. (PX-431 at CMM5220323, PSA for the 1997-4 Securitization at 79.) One such piece of information identified in section 7.8(b)(vi) was the amount of Realized Loss suffered by each group in the securitization. (*Id.* at CMM5220324, PSA for the 1997-4 Securitization at 80.) As noted earlier, *supra* at FF ¶ 49, Realized Loss, when read in conjunction with the definition of Net Liquidation Proceeds, was required to include unreimbursed Delinquency Advances. Thus, under the PSA for the 1997-4 securitization, Advanta was required to report to the trustee Realized Loss data that included unreimbursed Delinquency Advances.

16.    The only document in which Advanta reported data labeled as "Realized Loss" to the trustee was the LMLR. (PX-523 at DB 04208, Liquidation Mortgage Losses Report for the 1997-4 securitization.) The LMLR understated the Realized Losses because unreimbursed Delinquency Advances were not included in the reported Realized Losses. (Tr. 637:15-21; Tr. 649:10-19; *see supra* at FF ¶ 18.)

17.    The trustee then took the understated Realized Loss information provided by Advanta and used it to formulate the Realized Loss reported in the Statements to Certificateholders. (*See* Tr. 514:10-517:12.) Thus, the Realized Losses reported in the Statements were also understated. Under the PSA, the trustee was entitled to rely on the servicer to calculate and report Realized Losses properly (PX-431 at 104-05 (sections 10.3(a) and (f))), and was not required to insure that the data provided by

34

Advanta was correct. (*Id.*) Advanta was in the best position to correct any errors in the trustee's reporting of the Realized Losses in the Statements, but for whatever reason, chose not to do so.

18.     Advanta sent the Statements containing the understated Realized Losses prepared by the trustee to Chase upon Chase's request for information "in order to evaluate the residuals." (*See supra* at FF ¶ 16; PX-020 at ADVE00426808; D.I. 422 at ¶ 63; PX-023; PX-038; Tr. 781:22-782:17.)

19.     Because Advanta did not include unreimbursed Delinquency Advances in the Realized Loss information it reported in the LMLR, it breached section 7.8 of the PSA for at least the 1997-4 securitization, and in turn breached Section 4.11(b) of the Agreement, because Advanta was not in material compliance with all of its "Material Company Contracts."

### 5.     Section 4.27 of the Agreement

20.     Section 4.27 of the Agreement required that Advanta was in compliance with "[a]ll federal, state, local or foreign laws or regulations... ." (PX-001 at CMM5254289, the Agreement at 45.) Chase asserts that Advanta breached Section 4.27 because Advanta filed certain Statements with the SEC that violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(i), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.[36] (D.I. 452 at ¶ 192.) Section 10(b) provides, in relevant part, that

---

[36] The residual interests in the Advanta Securitizations are "securities" within the meaning of Section 10(b) of the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5. (D.I. 422 at ¶ 34.)

Each financial report that contains financial statements, and that is required to be prepared in accordance with (or reconciled to) generally accepted accounting principles under this chapter and filed with the Commission shall reflect all material correcting adjustments that have been identified by a registered public accounting firm in accordance with generally accepted accounting principles and the rules and regulations of the Commission.

15 U.S.C. § 78m(i).

21.     Rule 10b-5 provides, in relevant part, that

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

　　　(a) To employ any device, scheme, or artifice to defraud,

　　　(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

　　　(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

22.     Advanta submitted to the SEC the Statements during the first year of each

Securitization. (Tr. 1810:14-1811:20.) Chase asserts that those Statements did not

properly disclose the amount of Realized Losses, as that term is defined in the PSAs

for the Securitizations, because they did not include unreimbursed Delinquency

Advances. (D.I. 452 at ¶ 192.) However, there were essentially no Delinquency

Advances because there were essentially no losses experienced by a Securitization

within its first year. (Tr. 74:12-17; Tr. 797:20-798:8.) Losses do not register until the

servicer takes ownership of the property and liquidates it.[37] (*Id.*)  Therefore, Advanta did not materially misstate the Realized Losses in the Statements that were submitted to the SEC and thus did not violate Section 10(b) or Rule 10b-5 by submitting them. Consequently, Chase's argument regarding a breach of Section 4.27 of the Agreement fails.

### 6.    Section 4.22 of the Agreement

23.    Section 4.22 required that the Advanta balance sheet "was ... prepared in accordance with the books and records of the Company[,] .. fairly presents the financial condition of the Business... [,] and ... was compiled from the business books and records regularly maintained by the management and used to prepare the financial statements of the Company." (PX-001 at CMM5254289, the Agreement at 45.)  Chase asserts that the $17,516,456.43 in non-recoverable advances on zero balance loans was not disclosed on Advanta's Balance Sheet and that therefore, Advanta breached Section 4.22 of the Agreement. (D.I. 452 at ¶ 193.)

24.    Chase has not cited any facts or pointed to any evidence that may pertain to this issue and has thus failed in its burden of proving that Advanta breached Section 4.22 of the Agreement. (*See* D.I. 452 at ¶ 193.)

---

[37] This is akin to the explanation given by Chase for why it chose to focus on the 1997 Securitizations and not the "younger" ones (i.e. those issued after 1997). (See Tr. 797:20-798:8.)

37

### 7.    Sections 4.28 and 6.26 of the Agreement

25.    In Section 4.28 of the Agreement, Advanta warranted that "the information contained in the fields of [the June 30, 2000 Tape[38]] set forth in Section 4.28 of the Company Disclosure Schedule (i) was true and correct in all material respects and (ii) was a true and correct copy of the information relating thereto contained in the loan servicing systems of the Company... ." (PX-001 at CMM5254290, the Agreement at 46; see D.I. 422 at ¶ 93.) In Section 6.26 of the Agreement, Advanta made a similar warranty, that "the information contained in the fields of ... [the] Closing Tape set forth in Section 4.28 of the Company Disclosure Schedule: (i) shall be true and correct tin all material respects; [and] (ii) shall be a true and correct copy of the information relating thereto contained in the loan servicing systems of the Company... ." (PX-001 at CMM5254316, the Agreement at 72.) Chase asserts that the $17,516,456.43 in non-recoverable advances on zero balance loans was not disclosed on either the June 30, 2000 Data Tape or the Closing Tape, and that, therefore, Advanta breached Sections 4.28 and 6.26 of the Agreement. (D.I. 452 at ¶ 193.)

26.    It is true that neither the June 30 Tape nor the Closing Tape contained information about zero balance loans. (D.I. 422 at ¶¶ 92, 95.) The simple explanation is because the Tapes contained data for the active loans in which Advanta owned an interest, and an active loan is, by definition, not a zero balance loan. (Id. at ¶¶ 93, 96.) Moreover, Sections 4.28 and 6.26 only warrant that the information on the Tapes

---

[38] The June 30, 2000 Tape, and the Closing Tape, referred to herein, are magnetic computer tapes containing data on the active (i.e. not liquidated or zero balance) mortgage loans. (D.I. 422 at ¶¶ 91, 94.)

38

contained in the fields listed on Schedule 4.28 is "true and correct." (*See* PX-001 at

CMM5254290, the Agreement at 46; PX-001 at CMM5254316, the Agreement at 72.)

Because neither "advances" nor "advances on zero balance loans" is a field specified

on Schedule 4.28 (PX-371), Advanta's failure to include on the tapes advances on zero

balance loans did not breach Sections 4.28 or 6.26 of the Agreement.

### C.    Federal Securities Fraud, Common Law Fraud and Negligent Misrepresentation

27.    The elements of federal securities fraud under Section 10(b) and Rule

10b-5 and the elements of common law fraud in Pennsylvania overlap substantially.

For both, one must prove (1) a misstatement or an omission of a material fact, (2) with

scienter, (3) upon which the plaintiff reasonably relied, and (4) that the plaintiff's

reliance was the proximate cause of his or her injury, and, for federal securities fraud,

one must further prove that the foregoing was (5) in connection with the purchase or the

sale of a security.[39]  *See AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir.

2003); *see Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999), *supra* note 30 (noting the

elements of Pennsylvania common law fraud) (internal citations omitted).  For the

federal securities fraud claim, each element must be proven by a preponderance of the

evidence.  *See, e.g., Rowe v. Maremont Corp.*, 850 F.2d 1226, 1234 (7th Cir. 1988)

(noting the preponderance of the evidence standard for claims brought under Rule 10b-

---

[39] There is no dispute that the transaction at issue involves the sale of a security or the use of instrumentalities in interstate commerce. (*See* D.I. 422 at ¶¶ 62-63, 82-89 (referring to emails exchanged between the parties); Tr. 79:2-13 (referring to a telephone conversation).)  Thus, the focus is on the remaining elements of the causes of action.

5); *duPont v. Brady*, 828 F.2d 75, 75-76 (2d Cir. 1987) (noting the preponderance of the evidence standard of proof for claims under Rule 10b-5). For the common law fraud claim, however, each element must be proven by clear and convincing evidence. *See supra* at CL ¶ 2.

28.    The elements of a negligent misrepresentation claim under Pennsylvania law include: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in an injury to a party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999) (internal citations omitted). The elements of a negligent misrepresentation claim thus also overlap with the elements of the fraud claims, to a certain extent, including that the plaintiff must act in justifiable reliance on the misrepresentation. *Id.*

### 1.    Misstatements or Omissions of Material Fact

29.    A misrepresented or omitted fact is material if "there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available to the investor." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (internal quotation omitted).

30.    Advanta made several factual misstatements or omissions of fact in its dealings with Chase, including (1) providing Chase with Statements to Certificateholders and Remittance Rollups with understated historical Realized Losses, without telling Chase that the numbers reported as Realized Losses were inconsistent with the definition of that term in the 1997-4 securitization PSA, *see supra* at FF ¶ 16;

40

(2) providing Chase with the Confidential Memorandum which represented historical losses that excluded losses on account of unreimbursed Delinquency Advances, *see supra* at FF ¶ 13; (3) representing to Chase that the OCC's directive that Advanta use a 6% lifetime loss assumption was without basis and that Advanta's historical losses suggested a lifetime loss rate of 3.5%, *see supra* at FF ¶ 23; and (4) omitting to tell Chase that the Realized Losses presented in the Statements to Certificateholders were understated and out of compliance with Advanta's 1997-4 securitization PSA, *see supra* at FF ¶ 46.

31.    The foregoing misstatements and omissions of fact were material because a "reasonable investor" would be interested in the historical performance of a security he or she was purchasing, *see supra* at FF ¶ 25, and because witnesses from both parties agreed that the loss assumption is the most important factor in a valuation of Advanta's residual interests, *see supra* note 16.

### 2.    With Scienter

32.    In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), the Supreme Court noted that to prevail on a Rule 10b-5 claim, the plaintiff must prove scienter. In the Third Circuit, "a showing of recklessness satisfies the scienter requirement." *Healey v. Catalyst Recovery of Pa., Inc.*, 616 F.2d 641, 649 (3d Cir. 1980) (internal citation omitted). Common law fraud under Pennsylvania law can likewise be established by proving that the defendant acted recklessly. *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1252 (Pa. Super. Ct. 1983) (noting that "[i]t is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in

conscious ignorance of the truth, or recklessly without caring whether it be true or false.") (citing *Warren Balderston Co. v. Integrity Trust Co.*, 170 A. 282 (Pa. 1934)). Thus, the inquiry remains the same.

33.     A reckless statement is "one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999) (internal citations and quotations omitted).

34.     As described above, *see supra* at FF ¶ 46, Advanta was aware that several of its employees believed or at least were concerned that its unique posting hierarchy caused it to report understated Realized Losses and that it was out of compliance with the PSAs governing those securitizations. Mr. Rosoff's conversation with Mr. Hayden, however, was intended to assure Chase that Advanta's historical loss figures were reliable. *See supra* at FF ¶ 23. Further, when asked for information to "value the residuals," Advanta responded by providing the Statements to Certificateholders. *See supra* at FF ¶ 16. Thus, Advanta knew that Chase was intending to rely upon the information in the Statements in its valuation of Advanta's residuals. Supplying the Statements clearly presented a substantial danger of misleading Chase. *See supra* at FF ¶¶ 16, 46.

35.     In its dealings with Chase, these actions by Advanta establish by a preponderance of the evidence that it acted recklessly regarding the information it gave

42

or failed to give about its posting hierarchy and the effects that hierarchy had on its reporting of Realized Losses.

### 3.    Reasonable Reliance[40]

36.    This is the point at which Chase's fraud and misrepresentation claims break down.  In *Straub v. Vaisman and Co., Inc.*, 540 F.2d 591, 598 (3d Cir. 1976), the Third Circuit "identified a non-exclusive set of factors to aid in determining whether a party's reliance was reasonable under all of the circumstances." *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir. 2003) (citing *Straub*, 540 F.2d at 598).  Those factors include, "(1) whether a fiduciary relationship existed between the parties; (2) whether the plaintiff had the opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of long standing business or personal relationships; and (5) the plaintiff's access to the relevant information." *Id.* at 178-79.

37.    Another important factor to consider in regard to whether Chase acted reasonably in relying upon the information provided by Advanta is whether the Agreement contained an integration clause.  Although the Third Circuit recently ruled that an integration clause in a contract does not, as a matter of law, bar claims under

---

[40] Although the Third Circuit has stated that "[s]ince the failure to meet that standard [of establishing that the plaintiff acted reasonably] is in the nature of an affirmative defense, the burden of proof rests upon the defendant," *Straub v. Vaisman and Company, Inc.*, 540 F.2d 591, 598 (3d Cir. 1976) (internal citation omitted), placement upon the defendant of the burden of proving reasonable reliance appears contrary to the established principle that a plaintiff must prove each and every element of its cause of action to win its case.  *Cf. Zippertubing Co. v. Teleflex Inc.*, 757 F.2d 1401, 1412 (3d Cir. 1985) (noting that if the plaintiff meets its burden of proof on each and every one of the elements of the case, it would be entitled appropriate damages).  Regardless of whether the burden is placed on Chase or Advanta, however, the evidence discussed herein establishes that Chase's reliance was not reasonable.

43

the federal securities law, it did note that a plaintiff would have an "uphill battle" to establish reasonable reliance in the face of an integration clause. *Id.* at 181-82. Thus, "the existence of a non-reliance clause is ... one factor to consider in determining the reasonableness of a party's reliance." *In re Daimlerchrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 623 (D. Del. 2003) (citing *AES,* 325 F.3d at 180, 183).

38.     The first *Straub* factor favors Advanta because neither party asserts that a fiduciary relationship existed between the parties.  The second factor is, in this case, closely intertwined with the fifth factor and will therefore be discussed with that factor. The third factor clearly favors Advanta as well because neither party disputes that Chase is a sophisticated party with years of experience in the mortgage-backed security industry.  The fourth factor favors Chase because the parties had a long standing business relationship, during which Advanta serviced Chase's portfolio of subprime loans from 1996 through the transaction at issue in this case. *See supra* at FF ¶ 5. The second and fifth factors weigh significantly in favor of Advanta because Chase had access to relevant information which provided multiple opportunities to detect the misrepresentations and omissions about Realized Losses.

39.     Among the information Advanta provided to Chase were several disclosures which, upon a reasonable examination, would have alerted Chase that its loss assumptions, and hence its valuations of Advanta's Securitizations, were inconsistent with the historical and likely future performance of the Securitizations, or at least would have caused Chase to ask more questions about Advanta's reporting of losses.

40.     First, the Static Pool Analysis,[41] showed $6.3 million of "Unrecovered

Advances." When presented with the information contained in the Static Pool Analysis,

Bonnie Collins, who was primarily responsible for Chase's servicing due diligence, said,

with remarkable understatement, that "we [Chase] would all be interested in that." (D-

2163(3) at 222:3-15.)

41.     Second, Advanta's Credit Risk Executive Summary (referred to as M-5.3A

in the Data Room), which was requested and received by Chase's Mr. Whalen,

described Advanta's method of forecasting future losses. (D-561; Tr. 1464:5-17.) It

specifies that Advanta did not consider interest not collected from borrowers to be a

"credit loss" as that term was used in the documents. (D-561 at ADV020856; Tr.

1464:18-1465:8.) Mr. George Davie, the Chase employee assigned by Mr. Whalen to

review these documents, did not remember conducting the review, but he also noted

that, had he read the disclosure, he would have at least asked Advanta whether its

losses included interest. (D-2163(5) at 151:21-154:5, 155:10-156:16.)

42.     Third, Advanta's Prospectus Supplements for the Securitizations formed

in late 1993 through early 1997 noted that Advanta was reporting its managed portfolio

statistics to "exclude interest advances" on the serviced portfolio, so that the reporting

would be consistent with the presentation of Advanta's own portfolio. (PX-450.1001 at

CMM5215994; Tr. 1437:6-1438:18.) No Chase witness testified to reviewing the loss

information contained in the Prospectus Supplements.

---

[41] As noted, the Static Pool Analysis was a source of information for and
backtesting of Advanta's residual interest valuation process. *See supra* note 15.

45

43.    Fourth, when Mr. Pocisk, a Chase employee assigned to assist with Chase's due diligence, reviewed the total loss amount for Advanta's 1997-3 Securitization, he wrote "wow" next to that number because he had never seen losses so high. (D-Pocisk-5 at CMM5087964; Tr. 1769:3-1770:24.)

44.    Fifth, and most notably, Mr. Schiavone did not review any of the Statements to Certificateholders for any of the sixteen Securitizations formed before 1997.[42] (See Tr. 1023:21-1025:7.) Instead Mr. Schiavone focused on the Statements for the 1997 Securitizations.[43] (Tr. 790:9-11.) Mr. Schiavone admitted, however, that if he had reviewed the 1996-1 Statement, "it would have revealed a potentially significant discrepancy and probably would have caused us to ask further questions of" Advanta's employees. (Tr. 1023:17-1024:6.)

45.    Thus, had Chase reviewed and paid attention to these documents it would, at a minimum, have been prompted to ask further questions of Advanta's employees, which would likely have led Chase to realize that its and Advanta's use of terminology were not the same and that further information was needed for the valuation process.[44]

_____

[42] Someone at Chase evidently did review loss information from the 1996 Securitizations, because Chase compared that information to its loss assumptions for the 1999-2 securitization. See supra at FF ¶ 27.

[43] Even within that restricted realm, Chase could have seen, from the 1997-4 Securitization, that Advanta was using the term Realized Loss in an inconsistent manner. (PX-531.002 (reporting $0.00 in Realized Loss column on page 2, various dollar amounts for Realized Loss row on page 3, and over $14 million in Realized Loss column on page 4).)

[44] This is not to say that all of the documents were equally revealing. Rather, as a sophisticated party using historical loss information, a topic as to which these

46

46.     Finally, the Agreement contained an integration clause which provides, in relevant part, that "[t]his Agreement (including the Disclosure Schedules and the Ancillary Agreements) (a) constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all other prior disclosures, agreements and understanding, both written and oral (other than the Confidentiality Agreement referred to in Section 6.03(b) hereof to the extent set forth therein), among the parties or any of them with respect to the subject matter hereof ... ." (PX-001 at CMM5254328, the Agreement at § 11.03.) Unlike the contract in *AES Corp.*, however, the integration clause here, does not expressly disclaim Chase's reliance upon the information at issue. *See* 325 F.3d at 178 (the Third Circuit referred to such clauses as "non-reliance" clauses). Thus, the integration clause does not weigh strongly in either party's favor.

47.     Based on a consideration of all of the evidence presented by the parties, Chase's reliance was not reasonable under the standards set out in *Straub* and, thus, Chase has not established that Advanta committed common law fraud, federal securities law fraud, or negligent misrepresentation. *Cf. Wittekamp v. Gulf & Western, Inc.*, 991 F.2d 1137, 1144-45 (3d Cir. 1993) (finding that the plaintiff's reliance was unreasonable in the face of documents accurately disclosing the information asserted

_____

documents were relevant, Chase's failure to review them was unreasonable, based on a full consideration of the *Straub* factors. Another piece of information that could have prevented Chase from relying so heavily on historical loss figures was a due diligence report prepared by Mr. Steinmetz, a Chase employee assigned to perform due diligence, in which he warned Chase not to base assumptions (including loss assumptions) on the historical performance of Advanta's 1999 and 2000 Securitizations. (D-0347 at CMM042438.)

to be misrepresented or undisclosed); *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
748 F.2d 729, 737-38 (2d Cir. 1984) (rejecting the plaintiff's claim of reasonable
reliance when the plaintiff was a sophisticated party and had unfettered access to
accurate information).

## D.    Contract Damages

48.    In Delaware, "[t]he traditional measure of damages is that which is utilized
in connection with an award of compensatory damages, whose purpose is to
compensate a plaintiff for its proven, actual loss caused by the defendant's wrongful
conduct.  To achieve that purpose, compensatory damages are measured by the
plaintiff's 'out-of-pocket' actual loss."  *Strassburger v. Earley*, 752 A.2d 557, 579 (Del.
Ch. 2000).

### 1.    Section 6.24 of the Agreement

49.    As noted, *see supra* at CL ¶ 10, Advanta breached Section 6.24 of the
Agreement, which required that there be "no non-recoverable advances on zero
balance loans... ."  (PX-001 at CMM5254315, the Agreement at 71.)  Because there
were $17,516,456.43 in such non-recoverable advances as of the Closing, that
represents the actual loss suffered by Chase and, therefore, Advanta is liable for that
amount plus pre-judgment[45] and post-judgment[46] interest.

___

[45] "Prejudgment interest is available in Delaware as a matter of right."  *Am. Gen.
Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 13 (Del. Ch. 1992) (citing *Getty Oil Co., Inc.
v. Catalytic, Inc.*, 509 A.2d 123 (Del. Super. Ct. 1986)).

[46] 28 U.S.C. § 1961 provides, in relevant part, that "[i]nterest shall be allowed on
any money judgment in a civil case recovered in a district court."  *See Dean v.
Brandywine Studios Inc.*, No. Civ.A. 99-679(KAJ), 2003 WL 299362, at *3 (D. Del.

50.     Chase asserts that it is entitled to an award of attorneys' fees under Delaware law because the Agreement expressly provides for such an award.  (D.I. 452 at n.11.)  Section 10.01 of the Agreement provides, in relevant part, that "[t]he Company [Advanta] shall indemnify and hold buyer [Chase] ... harmless from and against any Losses suffered ... resulting or arising from any breach of any representation or warranty on the part of the Company ... under this Agreement... ." (PX-001 at 79, § 10.01(a)(1).)  "Losses" are, in turn, defined to include "reasonable expenses for attorneys."  (*Id.* at 23.)

51.     However, under Delaware law, "indemnification provisions are not applicable to claims between contracting parties; they are intended to protect one contracting party against liability from third party claims when the other contracting party is at fault."  *Pinkert v. John J. Olivieri, P.A.*, No. Civ. A. 99-380-SLR, 2001 WL 641737, at *6 (D. Del. 2001) (citing *DRR, L.L.C. v. Sears, Roebuck and Co.*, 949 F. Supp. 1132, 1142 (D. Del. 1996); *Cannon and Son v. Dorr-Oliver*, 394 A.2d 1160, 1165 (Del. 1978)). The indemnification clause in Section 10.01(a)(1) was intended to protect against third party claims and, therefore, Chase is not entitled to attorneys' fees.

### 2.     Section 4.11(b) of the Agreement

52.     As noted, *see supra* at CL ¶ 19, Advanta breached Section 4.11(b) of the Agreement because Advanta was not in material compliance with all of its "Material Company Contracts."  Chase asserts that "the damages ... with respect to Chase's

2003) (holding that "[p]ost-judgment interest on a monetary judgment is mandatory") (internal citations omitted).

overpayment flow equally from Advanta's breach of Section 4.11(b) of the Agreement."
(D.I. 452 at ¶ 190.)  Chase's theory for its recovery of damages for breach of this
section is essentially that the warranty provided by Advanta in Section 4.11(b) is
equivalent to a warranty regarding the accuracy of the loss figures reported by Advanta
under the PSAs to the trustee. (*See* D.I. 452 at ¶¶ 185-191.)  Thus, given its argument
for equivalence, Chase asserts that it was entitled to rely on the accuracy of the loss
figures.  Because Advanta understated the loss figures reported as Realized Losses, so
Chase's argument goes, Chase suffered damages of $67,776,142.27.  (D.I. 452 at ¶
191.)

53.     Chase's theory of recovery is fundamentally flawed because there is an
analytical gap between the warranty actually provided by Advanta and the warranty
which Chase wishes it had and under which it might have been able to recover
damages.  The warranty provided in Section 4.11(b) is not equivalent to a warranty of
the accuracy of the loss figures reported pursuant to the PSAs.  If Chase wanted a
warranty regarding the accuracy of the loss figures reported pursuant to the PSAs, it
was incumbent upon Chase to obtain such a warranty.  The warranty that Chase
obtained in Section 4.11(b) is not sufficient, in and of itself, to constitute a warranty of
the accuracy of the loss figures.[47]

---

[47] The warranty contained in Section 4.11(b) appears to be aimed at nothing
more than protecting Chase from third party claims, an expectation which would be
reasonable based on the language of the Section which invokes concern about a
breach of the "Material Company Contracts."  Regardless of aim of the warranty,
however, Chase has not proven that the breach of the promise concerning compliance
with "Material Company Contracts," including the PSAs, caused any damage to Chase.

54. Chase has thus failed to establish that the damages it allegedly suffered flow from, or were caused by, Advanta's breach of Section 4.11(b). Therefore, Chase is not entitled to damages based upon Advanta's breach of Section 4.11(b).

## E.    Advanta's Counterclaim

55. The Post-Closing Letter dated as of February 28, 2001 required Chase to release to Advanta an amount of money equal to the number of document exceptions no longer outstanding as of the Closing.[48] (*See* D-2016 at CMM5254351, Post-Closing Letter at 2.) Thus, the amount that should have remained in the Document Holdback Account would be equal to the number of document exceptions still outstanding as of the Closing multiplied by $55 per document. (*See id.*; *see supra* at FF ¶ 52.)

56. The total number of document exceptions outstanding as of the Closing was 6,306. *See supra* at FF ¶ 54. Thus, $346,830 should have remained in the account as of the Closing, and the remaining $923,170 should have been released to Advanta.[49] Chase has not released any of the $1,270,000 that was placed in the account. (Tr. 1861:4-6.) By not releasing the difference between the $1,270,000 and $346,830, $923,170, Chase breached the terms of the Post-Closing Letter.[50] Advanta

---

[48] Although Advanta asserts that Chase has also refused to release funds from the Document Holdback Account periodically as other issues relating to the defective or missing documents were resolved, this assertion is outside of the scope of Advanta's counterclaim which seeks damages based on a breach of the Post-Closing Letter only. (D.I. 30 at ¶¶ 166-172.)

[49] This figure is calculated by multiplying $55 times the outstanding 6,306 documents, which equals $346,830.

[50] Although the difference between these two figures is $923,170, for reasons not clear to me Advanta seeks only $824,190. (D.I. 30 at ¶ 172.)

51

is therefore entitled to the amount it sought, $824,190, plus pre-judgment[51] and post-judgment[52] interest.

## IV.   SUMMARY OF CONCLUSIONS

57.   In summary, for the reasons expressed herein, Advanta is liable to Chase for $17,516,456.43, plus pre-judgment and post-judgment interest, and Chase is liable to Advanta for $824,190, plus pre-judgment and post-judgment interest.

---

[51] *See supra* note 45.

[52] *See supra* note 46.